FILED

2020 Sep-25  PM 12:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| CHAD AWAYZO HUBBARD, | ) |
| | ) |
| CLAIMANT | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 5:19-CV-276-KOB |
| | ) |
| ANDREW SAUL | ) |
| COMMISIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| RESPONDENT | ) |

## MEMORANDUM OPINION

### INTRODUCTION

On June 9, 2015, the claimant, Chad Hubbard, protectively applied for disability insurance benefits and supplement security income benefits under Titles II and XVI of the Social Security Act. The claimant alleged disability beginning May 14, 2014 because of schizophrenia, bipolar disorder with manic and psychotic features, and cannabis dependence.. On October 15, 2015, the ALJ denied both claims. The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on August 3, 2017.  (R. 10).

In a decision dated July 6, 2018, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, therefore, was ineligible for social security benefits. On January 15, 2019, the Appeals Council denied the claimant's request for review. Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 7–23). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES and REMANDS the decision of the Commissioner to the ALJ.

1

## ISSUE PRESENTED[1]

Whether the ALJ's finding that the claimant's schizophrenia does not meet Listing 12.03C lacks substantial evidence.

## STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen,* 826 F.2d 996, 999 (11th Cir. 1987).

"No…presumption of validity attaches to the [Commissioner's] legal conclusions, including the determination of the proper standards to be applied in evaluating claims." *Walker,* 826 F.2d at 999. This court does not review the Commissioner's factual determination *de novo*. The court must affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 402 (1971).

The court must keep in mind the opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions…but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a

---

[1] The claimant also raises issues regarding the pain standard and weight the ALJ gave to different medical opinions. But because the court will reverse on this issue involving Listing 12.03C, the court will not thoroughly address these other issues.

question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with ALJ about the significance of certain facts, the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing the court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen,* 804 F.2d 1179, 1180 (11th Cir. 1986).

## LEGAL STANDARD

The claimant bears the burden of proving that he is disabled. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  The claimant may establish his disability if he establishes that his impairments meet or equal a Listing. *See* 20 C.F.R. §§ 404.1525, 416.925.  To "meet" a Listing, a claimant must "show that his impairment matches a listing [and] meet[s] all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Bailey v. Soc. Sec. Admin., Comm'r,* 782 F. App'x 838, 840 (11th Cir. 2019). "If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled." *Id.*

To meet Listing 12.03 involving the schizophrenia spectrum and other psychotic disorders, the claimant must satisfy A and B or satisfy C of the following requirements:

A.     Medical documentation of one or more of the following:

3

    1.   Delusions of hallucinations
    2.   Disorganized thinking (speech); or
    3.   Grossly disorganized behavior or catatonia.

**AND**

B.    Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
    1.   Understand, remember, or apply information.
    2.   Interact with others.
    3.   Concentrate, persist, or maintain pace.
    4.   Adapt or manage oneself.

**OR**

C.    Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
    1.   Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder; and
    2.   Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03.

## FACTS

The claimant was thirty-seven years old at the time of the ALJ's final decision. (R. 23, 154).  He lives with his mother and younger brother in his mother's house.  (R. 495).  The claimant has a high school education and past relevant work experience as a cleaner, kitchen helper, fast food cook, moving van driver/helper, hand packager, and assembler. (R. 54, 197). He alleges disability beginning May 14, 2014 because of schizophrenia, bipolar disorder with manic and psychotic features and cannabis dependence. (R. 13, 31–32, 154, 196).

*Mental Impairments*

The claimant testified that doctors diagnosed his schizophrenia in 2005.  (R. 38).  On July

15, 2011, police brought the claimant to Huntsville Hospital  for a psychiatric evaluation after

the claimant had been sleeping outside and talking to invisible people.  The medical notes

indicate that the claimant has a history of schizophrenia and past hospitalizations for his

psychotic behavior. The claimant reported that he hears "spirits" telling him that he should go to

the hospital; that he cannot sleep because of the voices; and that he "live[s] by self with others."

He stated in the "Psychosocial Assessment" that "everybody hates me" and "what is family when

no one cares."  The record states that the claimant has not been compliant on his medications

because he "Do[es]n't like the control—use my free will to take meds"; tested positive for

marijuana; and "now is responding to internal stimuli."  (R. 547-553).[2]

On April 9, 2012, the claimant's mother called an ambulance to take the claimant to

Huntsville Hospital for a psychiatric evaluation.  The claimant got into an argument with his

mother over his "long-held delusion about Sabbath and Saturday and not working."  He believed

that a conspiracy exists "about law being forced to make people work on a particular day," and

that the law is trying to make people "lose their free will."  He was "aggressive, agitated, upset

and started yelling and cursing at [his] mother" and approached her in "menacing" manner.  (R.

498).

The claimant initially agreed to a voluntary admission to the hospital, but later requested

to leave against medical advice.  So, on April 9, 2012, his mother filed a "Statement of Intent to

File Petition for Involuntary Admission to BHS" and the hospital admitted the claimant

---

[2]  The records from the July 2011 hospitalization do not indicate discharge plans or medications.  Later medical records indicate that the claimant was hospitalized at Huntsville Hospital Behavior Health Unit on August 17, 2011, but the court can find no records of that hospitalization.  *See* (R. 561).

involuntarily.  The "Past Psychiatric History" section of the notes indicates that the claimant has a history of hospitalizations at North Alabama Regional Hospital, Decatur General West, and Huntsville Hospital Health Unit and that his last admission was July 14-18, 2011.  On the "Psychosocial Assessment" for the April 9, 2012 hospitalization, the claimant listed himself as his "primary support person" and listed his younger brother Jamaal, not his mother, as the support person with whom the hospital could communicate.  (R. 498-501).

He tested positive for marijuana but reported being compliant taking Invega for his schizophrenia.  The records indicate that the claimant had "unkempt grooming" and "poor hygiene"; was delusional at times; laughed excessively; mumbled and talked to himself; and had poor insight and judgment.  Dr. Tarak Vasavada discharged the claimant on April 12, 2012 to "probate court with possible transfer to the mental health center, Praxis Respite Service" with a diagnosis of schizophrenia and prescribed the claimant 80 mg Geodon two tablets nightly and ordered 25 mg injections of Risperdal every two weeks, with the next injection on April 22, 2012.  (R. 501, 505, 512, 520).

Licensed Professional Counselor Christopher Ross at the Mental Health Center saw the claimant on August 7, 2013 and indicated that the claimant is a "long term client here at MHC." The claimant reported that he was working at MATSU Auto in Madison for the past several weeks.  Mr. Ross noted that the claimant is "on his Risperdal regimen and he is about to run out in the next 7 days."  His past diagnosis included "Paranoid Schizophrenia."  (R. 312-315).

On September 10, 2013, paramedics took the claimant to the Huntsville Hospital Emergency Department because the claimant "has been hallucinating and acting violent" for the past day and laughing for no reason.  The claimant said he was "hearing voices" that "keep repeating the name of a coworker" and had visual hallucinations of a "man, a woman, [and]

another man with long brown hair." He told doctors that "he wouldn't be like this today if he hadn't prayed for an enemy at Oakwood in 2005." The medical notes from this visit indicate that the claimant had not been compliant with his mental health treatment and had a history of admissions to North Alabama Regional Hospital, Decatur General West, and Huntsville Hospital Health Unit and was last admitted in April 2013.[3] Dr. Kumar indicated a diagnosis of schizophrenia; discharged the claimant with "medications"; and told him to follow up at the Mental Health Center of Madison County. (R. 493-496).

Progress notes from the claimant's therapy session at the MHC of Madison County on April 2, 2014 indicated that the claimant has occasional auditory hallucinations that "comment to him related to activities at VBC" and he answers the voices with profanity at times. His mother stated that he talks to his voices and that he "tried to keep a job but does not last more than a month or two." The psychiatric evaluation revealed that the claimant had "poverty of thought," circumstantial associations, paranoia, a blunted affect, and limited insight. (R. 723-728).

On May 12, 2014, Huntsville Hospital Behavioral Health Unit involuntarily committed the claimant after he quit taking his medication, causing delusions and auditory hallucinations. The claimant was "acting delusional" claiming that his name is "Jacob, not Chad." He had been violently cursing the voices he hears and cursed his mother and pushed her to the ground. He stated that "he does not hear people who are not there." (R. 304-307, 561).

Records from the May 2014 hospitalization indicated that the claimant had been hospitalized at Huntsville Hospital in November 2010, June 15, 2011, August 17, 2011 and had been "released from DGW 2 weeks ago." Dr. Vasavada noted that the claimant tested positive

---

[3] The court can find no hospitalization records for the claimant for April 2013.

7

for marijuana and had poor insight and judgment because of medication noncompliance; hallucinations; and "grandiose, religious delusions." Dr. Vasavada diagnosed the claimant with bipolar disorder manic with psychotic features; prescribed the claimant Invega and Invega Sustenna; stated that the claimant "might even be eligible for a group home"; and discharged the claimant to the probate court. (R. 560-562, 570-572).

Upon the recommendation of Dr. Kumar at Huntsville Hospital, beginning May 14, 2014, the claimant spent fourteen days as an impatient at Crisis Residential Care because of non-compliance with medication, delusions, and auditory hallucinations. (R. 305–07; 788–89). Primary provider Ray Owen, MS., noted in his "Psychosocial Assessment" that the claimant had an abnormal thought process, apprehensive facial expressions, appeared anxious with poor judgment, but was appropriately dressed, with intact memory and normal speech. (R. 305–07). During the claimant's inpatient hospitalization, Dr. Ammar Alrefai noted in the claimant's "progress notes" that the claimant had a stable mood, appeared pleasant and cooperative, was easily directed, and was sleeping well, with no overt psychosis or psychotic symptoms. On May 28, 2014, Dr. Alrefai discharged the claimant, instructing the claimant to continue follow-up treatment with the Bridge Team at the Mental Health Center. (R. 260–67).

On May 28, 2014, Licensed Professional Counselor, Reese Jefferson[4] with the Bridge Team at the Mental Health Center saw the claimant for a therapy session. The claimant reported that he has heard voices since 2005; has worked "odd" jobs through Labor Ready; and smokes marijuana sometimes. Ms. Jefferson noted in the claimant's "Psychosocial Assessment" that he had fair hygiene and dress; fair eye contact; a flat affect; and pressured speech with preoccupied thoughts, changing the subject often in mid-sentence.   (R. 308–11).

---

[4] The ALJ referred to Ms. Reese as a Nurse, but she has her Masters in Counseling and is a Licensed Professional Counselor (LPC).

From June 3 to September 2, 2014, the claimant continued follow-up treatment at his home on a weekly basis with Ms. Jefferson with the Bridge Team at the Mental Health Center. In his June 6 session, he indicated that he was "not 'happy' about his mom's statement of him having to 'move out' soon" because he would have to go to a shelter. During his June 20 session, he reported hearing auditory hallucinations; admitted to smoking marijuana; and stated he was working for a landscape company. By the June 24 session, he had lost his job because he "wasn't working fast enough and had to ask the other guys to start the weed eater." He also reported hearing voices but listening to music "seems to help stop the voices." (R. 721-715).

Ms. Jefferson reported in her notes for the July 1, 2014 session that the claimant's behavior and speech were "bizarre."  He dragged out his words and did odd gestures with his fingers.  He mentioned wanting to get a credit card, so he could work for Amazon from home. He told Ms. Jefferson during the July 9 session that he "thinks he was able to deal better with voices when he is on the medicine Risperdal," and Ms. Jefferson told him she would discuss with the team changing from the Invega injections to Risperdal.  His speech was slow and dragged out; he reported auditory hallucinations; and he said he had not smoked marijuana because he had no money to buy it.  In the July 17 session, he said he was not hearing voices that day but would listen to music if he did hear voices. He agreed to continue with his medication injections although he "does not notice any difference with taking the injection as opposed to not taking the injection."  (R. 710-713).

During the July 31, 2014 session with Ms. Jefferson, the claimant reported auditory hallucinations and paranoia. He stated that "he thinks people can hear what he is thinking and that he some how affects how people act."  He told Ms. Jefferson that he started hearing voices in 2005 after he "prayed for the enemy" who he said was "the devil."  He admitted using

marijuana and agreed to continue taking his medication injections.  In the August 6 session, he said he hears voices "mostly saying people that I know"; he continued to talk about "praying for the enemy" in 2005, but also said he "introduced 'a young lady to one of my friends but I shouldn't have done that.'"  Ms. Jefferson noted that the claimant would repeat under his breath "three days to Sabbath" throughout the session. He indicated that he wanted to move out of Alabama because "people know too much about me here."  (R. 703-706).

He reported to Ms. Jefferson during the August 14, 2014 session that "he constantly hears people talking about him" and that, when he goes out, he is "positive that people are talking about him."  He said that listening to music and sleep help him not hear the voices.  At this visit, he constantly repeated under his breath "two days to Sabbath" throughout the session.  In the August 18 session, he reported to Ms. Jefferson "irritation" about the voices and that he is "tired of hearing about the same two people"; that he thinks one of the voices it trying to steal his identity and pretending to be him; and that his problems could easily be solved if he could be in a relationship with a female.  Ms. Jefferson noted that the claimant seemed "hopeless" in finding a solution to the problems he was having with the voices; but he said "sleeping helps him cope with the voices mainly because while he is sleeping he does not hear any voices."  He said smoking marijuana was not his problem and that moving out of Alabama was the "only way" to solve his problems.  (R. 699-702).

At the September 2, 2014 session with Ms. Jefferson, the claimant again reported that he was "tired of hearing the voices"; that he thinks "this guy" is trying to steal his identity; that "this guy" is disguising himself as the claimant and "all the girls think this guy is me."  Ms. Jefferson reported that the claimant "needs inpatient treatment," but that his situation was "not bad enough for a petition at this time."  She described his progress toward his goal as "poor."  (R. 697-698).

The claimant's mother called the police on the claimant on March 25, 2015 after he became increasingly "unmanageable" at home and noncompliant with his medications and treatment.  He refused treatment and would disappear from the house in the middle of the night, so his mother had him involuntarily committed to Huntsville Hospital for a psychiatric evaluation.  According to his mother, the claimant left Alabama in September 2014 and ended up in Las Vegas at his brother's home. He left Las Vegas and went to Los Angeles.  In February 2015, the claimant's mother "sent for him to come to Alabama when he reached out to her" but he refused treatment.  The claimant was unable to sleep because he heard voices; the nurses observed the claimant "talking to himself in the room and he keeps referring to someone by the name of Avery and Simmone."  (R. 433).

Dr. Trevor Lindsay treated the claimant at Huntville Hospital for the March 2015 admission. Dr. Lindsay noted that the claimant had poor hygiene; delusional thought process; depressed affect and mood; and poor insight and judgment.  His impression include "History of bipolar with psychotic features."  The claimant's functional assessment while an inpatient revealed that he was "unable to complete remaining 2 of 3 simple and complex steps"; that he needed "extra time to complete 1 simple step"'; and that he had poor memory, poor ability to identify or communicate his needs, and poor ability to maintain his health. Dr. Lindsay discharged the claimant on March 27 with "Probate Court" listed as the "Follow-up Plan."  (R. 433-440).

Upon the Probate Court's order, the claimant saw Jamia Davis, MS at Wellstone Behavioral Health on March 30, 2015 for a psychiatric follow-up.  Her notes say that "according to the [Probate Court] petition," the claimant was increasingly delusional, was not sleeping, had severe aggression, would wander through the night, and became "increasingly violent towards

his mother" who was in fear for her safety.  His dress was "disheveled"; his grooming was "poor"; he had loose associations and illogical thinking; his judgment and insight were poor. Ms. Davis recommended "a stay up to 150 days to include medication monitoring and full psychiatric services."  (R. 298-303, 433-434).

On April 29, 2015, Registered Nurse Sharon Wright at the Madison County/Wellstar Acute Care noted that the claimant appeared calm, treatment compliant, and stable. Ms. Wright instructed the claimant to follow-up with the Bridge Team at the Mental Health Center and to continue taking medications as prescribed. (R. 316–17).

From May 25  to September 4, 2015, the claimant saw his counselor Ms. Jefferson with the Bridge Team at the Mental Health Center at least every two weeks. In his May 25, 2015 session, Ms. Jefferson noted that the claimant reported hallucinations and delusions, had odd behavior, spoke in a high-pitched voice, often laughed inappropriately, but had fair hygiene and dress. In his May 31 session, Ms. Jefferson noted that the claimant's speech contained delusions and paranoia about "how he thought someone else was taking his identity, which has prevented him from finding a girlfriend" and that he "now has no identity."  She noted that the claimant's delusions and paranoia increases his "risk for re-hospitalization."  (R. 689-695).

During the June 13 and June 28 sessions with Ms. Jefferson, the claimant expressed some paranoia, stating that "he thinks that the government put cameras 'in the house' to watch his every move" and he continued to hear voices.

His mother Linda Faye Hubbard completed a "Function Report—Adult—Third Party" on July 11, 2015 at the request of the Social Security Administration.  She stated that the claimant lives with her and she takes him to his doctor's appointments.  She reported that the claimant wakes up early sometimes "shouting at the voices he hears" and "talks back to the voices"; he

hardly combs his hair or shaves; he sometimes wears the same clothes for days even though he takes a bath; she gives him his medications; he sometimes forget ingredients when he is cooking because he starts "talking with the voices he hears"; he goes on walks every day to help him with the voices; and he goes to the library to get on the computer.  She said that his voices keep him from completing a task or concentrating; that his co-workers get upset or afraid when the claimant talks to the voices; and that the claimant is very stressed about not being able to keep a job.  (R. 202-209).

In his July 8, July 27, August 9, and September 4 sessions, the claimant continued to have auditory hallucinations, but said that the voices were "not bad" and he tries to tune them out. During the August 9 session, his speech appeared "higher pitched, with dragged out and exaggerated words."  He reported at the September 4 session that he had used marijuana and Ms. Jefferson noted his progress was "poor to fair" because of his auditory hallucinations and marijuana usage.  (R. 672–96).

Upon referral by the Social Security Administration, psychiatrist Dr. Justin Anderson conducted a "Psychological Evaluation" of the claimant on September 17, 2015. The claimant reported his history of schizophrenia. At the time of the interview, the claimant reported "voices were in the background saying, 'I'm Chad Awayzo Hubbard' and said that the voices like using his name 'upon themselves.'"  He stated that "it is hard to tell at times if the voices are real or not and that it affects his concentration" and that he was "last able to work" in 2012 because the "voices would interfere with his concentration."  (R. 613-614).

He claimed that his current medications Invega and Saphris "somewhat" manage his symptoms; he usually gets along well with co-workers and supervisors; he has no difficulty dealing with crowds; and he visits weekly with friends and family.  He performs household

chores and tries to stay busy, "otherwise the voices are overwhelming."  He cares for his

hygiene, but Dr. Anderson noted that he exhibited "questionable personal hygiene (unkempt

beard and long dirty fingernails)".  The claimant makes simple meals; shops; does not drive

because he has no driver's license; has no hobbies; does not attend church; and watches no

particular programming on TV.  (R. 614-617).

   Dr. Anderson noted that the claimant was cordial and cooperative; his "thought

processes were linear and logical but he reported hearing voices, "usually talkative people he

used to work with or references to him about things going on"; the voices often interrupt his

concentration; and his affect was blunted, "yet he also laughed at inappropriate times." (R. 616).

   Dr. Anderson opined that the claimant could understand and remember simple and

detailed instructions; sustain attention for periods of two-hour segments for simple tasks with

occasional redirection; have occasional, superficial contacts with coworkers and supervisors but

no public contact; and adapt to a static work environment with infrequent changes. Given his

cognitive and mood difficulties, Dr. Anderson found that the claimant has mild limitations in

understanding/remembering detailed instructions; marked limitations in concentration,

persistence, and pace and interacting; marked limitations in his ability to interact socially;

moderate limitations in adapting to routine stressors/changes of a general work environment; and

frequent periods of decompensation. Additionally, Dr. Anderson noted that if the ALJ awarded

the claimant benefits, he likely will require assistance managing those funds because of his

estimated level of current cognitive ability. (R. 613).

   On October 14, 2015, psychologist Dr. Robert Estock assessed the claimant's mental

capacity at the request of the Social Security Administration by reviewing the claimant's medical

records.  Dr. Estock opined that the claimant had moderate limitations in his activities of daily

living, social functioning, and concentration, persistence or pace; could expect one or two episodes of decompensation; and had marked limitations in his ability to understand and remember detailed instructions. Dr. Estock also opined that the claimant could understand/remember simple instructions but not those more detailed/complex; could carry out simple tasks for extended periods in the regular workday; would function best with his own workspace and apart from others; should have casual contact with the public and coworkers; should have casual and supportive and non-confrontational criticism and feedback; could adapt to infrequent, gradual changes; and would likely need assistance with long-term goals and plans. (R. 67–70).

From October 13, 2015 to January 14, 2016, the claimant continued to see Ms. Jefferson with the Bridge Team at the Mental Health Center for counseling every two weeks. On October 13, 2015, the claimant told Ms. Jefferson that he told the "disability doctor" that he was hearing voices and "how difficult it is to work and hear voices at the same time." He reported that he "is working and has been working for about a month." Ms. Jefferson noted that the claimant jumped around frequently from subject to subject and listed his progress as "poor" because he continued to hear voices that "seem to be affecting his mood and mental stability." (R. 670).

By the October 28, 2015 session, the claimant had lost his job because "he did not do well working because he heard the voices" and that he "messed up on the job while cleaning." He reported at the November 2 session that he thought the "voices are getting worse" and that his injection "may need to be increased." He explained that when he gets the shot, the voices are not as bad; but as the injection "wears off" the voices "start up again." The "only thing that helps with voices is sleeping." (R. 661-664).

At the November 23, December 2, and December 11 sessions with Ms. Jefferson, he continued to report that he heard voices, but they were not as bad right after his medication injections. He stated at the December 23 session that his voices were "still present as much as they have been" but they are not "condescending like they have been." During the December 28 session, he expressed paranoia and stated that he "thinks he is being watched." He described the voices as being "out of control" and said that "most of time" the voices "talk about the guy I used to work with at the Von Braun Center" and keep repeating that "guys name over and over." During his January 14, 2016 session with Ms. Jefferson, the claimant did not display any paranoia or delusional thought but did report that he "can't work with hearing these voices." (R. 643-657).

The claimant did not show up for his sessions with Ms. Jefferson from January through June 10, 2016. He apologized to Ms. Jefferson and said he would "do a better job of making contact." He reported that the voices are at times "too much" and that sleep is the only relief for him. He said he tried to work a part-time job, but "he has difficulty maintaining on task due to the voice talking to him constantly." He said, "I'm going to do my best . . . but it gets hard with the voices there." At the June 23 session, he expressed delusions about someone trying to take his identity and that the "news talks about him." "I was watching the news . . . and they kept saying my name . . . I don't know why they would be talking about me." He described the voices as "annoying" and "frustrating." He said the voices will be worse next week because "that's when I know the shot is wearing off." Ms. Jefferson explained that she will recommend that he take his injection every "3 weeks as opposed to every 4 weeks." (R. 640-641).

At his sessions with Ms. Jefferson in July and August 2016, he continued to report hearing voices and expressed paranoia and delusions. He reported that the voices "keep taunting

me about a guy I used to work with"; that he does not know if the voices "he hears are real or not"; that the voices "keep calling him by another name" and are "trying to take my identity or something"; that he is frustrated with hearing the voices; that the voices "are getting out of control"; but that his injections seem to help the voices.  (R. 624-636).

During his September and October 2016 sessions with Ms. Jefferson, he talked about finding employment. When Ms. Jefferson asked him about his plan for the voices while he is working, he stated that "I think I'll be alright."  But he reported that "he was set to work but that he was afraid that the voices were 'gonna be too bad to focus.'"  His speech continued to express paranoia and delusions, including "certain people taking his identity" and "trying to have my baby." He said, "he thinks that he is important and relevant that people try to take his identity." He said the injections "diminish" the voices.  (R. 619-623, 781-782).

During his November 2, 2016 session, his speech contained no delusions, but he reported hearing voices.  He said the injections "buffer" the voices but that the voices still "prevent him from being able to function."  He admitted that he had "relapsed" and smoked marijuana about two weeks prior.  By the November 9 session, his delusional speech and paranoia returned, and he continued to report smoking marijuana that Ms. Jefferson noted "can affect [his] psychiatric stability."  During the November 17 session, he asked Ms. Jefferson if he could go back to having his injections every 4 weeks instead of every 3 weeks because "one time I got it in 4 weeks not 3 and I wasn't hearing the voices."  His delusional speech continued during his December sessions, and he reported still hearing voices but he "listens to music, takes naps, or will exercise to control the voices."  (R. 769-773).

In his three January 2017 sessions with Ms. Jefferson, he continued to report hearing voices and having delusional speech.  He stated that "the voices talk to him all day" and repeat a

17

guy's name that he knows; that the voices have gotten worse since 2011 when "that guy was messing [with] a girl I knew."  He said that "a lady friend," "getting my disability" and "moving out of Alabama" would "stop" the voices that he hears.  The claimant expressed paranoia while watching the news.  He said the voices "let up" when he takes the Saphris.  (R. 761-768).

Nurse practitioner Sean Riggs with the Bridge Team saw the claimant on January 9, 2017.  The claimant reported appropriate sleep of 5-8 hours a night; weekly marijuana usage; and sometimes "unbearable" auditory hallucinations "saying other people's  names" that "make it really hard to concentrate." He stated that he works out and walks to the library "as good distracters" to manage the voices.  NP Riggs noted that the claimant had an inappropriate affect; blunted mood range; and fair insight and judgment.  NP Riggs' diagnosis was schizophrenia and he continued the claimant's injections of Invega Sustenna every three weeks and added a prescription for 5mg of Saphris.  (R. 745-750).

On January 24, 2017, Ms. Jefferson submitted her opinion that the claimant meets Listing 12.03 and has marked limitations in maintaining social functioning and maintaining concentration, persistence, or pace. (R. 233–34).

In his February 2017 session with Ms. Jefferson, his speech contained some delusions and paranoia and he "appeared preoccupied with his thoughts."  The claimant reported to Ms. Jefferson that he hears voices but thinks they have been a "little better."  But he continued to smoke marijuana and said he had a court hearing "next Monday" that will decide whether he "gets to go to mental health court or be sentenced for maybe one year and a day."  During his two April 2017 sessions, he reported that he "has to do mental health court" on the first and third Fridays and that he continued to hear voices that "are  having conversations about what happened in the past."  He told Ms. Jefferson that the last time he went to jail was on a forgery

charge and that he had to do mental health court.  He also admitted to continued marijuana use and said "I gotta stop" and "I'm going to stop."  (R. 751-761).

On May 1, 2017, licensed counselor Errica McCaleb with Wellstone Behavioral Health assessed the claimant for inpatient drug treatment. The claimant reported that he had used marijuana daily for 18 years and that the marijuana calms him down.  He hears voices "say a lot of names, and they say stuff like I'm on other drugs that I am not doing." He stated that "it makes him feel bad because I know I'm not using anything."  The claimant also reported that the voices say "negative things to me, and it hurts my feelings" and "the voices say they are going to change my name from Chad to Jacob."  He said his triggers include "[f]ussing with the voices, them dismissing me to the point where I can't take it" and "the voices lying about what I do and who I am."  Ms. McCaleb noted that the claimant met the criteria for inpatient drug treatment, but could not be placed inpatient at New Horizons because of his active psychosis and hallucinations.  So, she referred his case to medical services for further treatment.  (R.786–797).

On May 10, 2017, the claimant followed up with NP Riggs with the Bridge Program. The claimant reported frequent cannabis use and active auditory hallucinations. The claimant reported his mood as "good when I don't hear voices, but they make me really stressed because all they do is put me down . . . I think it's real people sometimes like I have super-hearing or something."  NP Riggs noted that his condition was "worsening" but continued him on his current medications. (R. 739–743).

On June 1, 2017, NP Riggs submitted a "treating source statement" with an opinion that the claimant met Listing 12.03 because of his schizophrenia.  (R. 731-733).

*The ALJ Hearing*

At the hearing before the ALJ on August 3, 2017, the claimant testified that he has past relevant work experience as a cleaner, kitchen helper, fast food cook, moving van driver/helper, hand packager, and assembler. (R. 54).

The claimant stated that Peoplefinders, where he previously worked as a general laborer, terminated him in 2015 because of his schizophrenia. He was diagnosed in 2005 and has been hospitalized several times in 2014 and 2015 because of "violent verbal outbursts."  The voices started after he prayed for the devil to be saved.  He stated that hearing voices "drained [him] of [his] energy" to the degree that he was incapable of "[doing] the job properly." The claimant further stated a feeling of "exhaustion" and that his "energy level [was] drained as a result of that." The claimant testified that the voices he would hear were "like visible people that [weren't] really there," and that "as a result of talking back, [he] wasn't able to…keep up with the speed required to do the job."  He admitted he has worked in the past, but he is not able to work anymore because of the "intensity of the voices that I be hearing. They take away my concentration . . . . So, I feel like I won't be able to listen to basic instructions on how to complete the task because the voices drown out other people's voices."  (R. 33-35, 40-42, 49-50)

The claimant accused the voices of trying to "use [his] identity," and "pretend that they're [him] to become romantically involved with women." He testified to being hospitalized because verbal outbursts that took place "one to four weeks per month." He specifically stated that he would sometimes "sit there and … scream out curse words," startling those around him because the "voices keep talking about other people."  He said he was hearing voices during the hearing talking about other people.  (R. 39–42).

20

The claimant testified that he forged documents because the voices in his head told him to do so.  Because of the forgery, the court sentenced the claimant to mental health court to monitor his compliance with treatment, therapy, and drug screens.  He testified that he has attended mental health court for two months without a failed drug screening. He said that "it wasn't marijuana that [caused] the voices," and that medication helped some.  The claimant testified that he stopped smoking marijuana in May 2017 and that he could afford it by using money he borrowed from his mother for cigarettes. (R. 45-49).

He said he sleeps to "escape from the voices," but if he sleeps too long, "then they might like steal my spirit from me that I have inside me. And that would kind of be like a bad deal if that happened."  The voices will wake him up from his sleep.  The claimant testified that his medications and injections of Invega are not really helping because he still hears the voices.  (R. 44-48).

In addition to working a part-time job, the claimant stated that he was able to dress himself, tie his shoes, use the internet, buy cigarettes, communicate with people on Facebook, play basketball once or twice a month, prepare meals, and seek dates online. He stated that he sometimes drives to the library right down the street from his house, but he does not drive much because of his lack of concentration.  (R. 35–38, 49, 50).

A vocational expert, Marilyn Stroud, testified concerning the type and availability of jobs that the claimant was able to perform. Ms. Stroud testified that the claimant's past relevant work experience was as an industrial cleaner, kitchen helper, fast food cook, tractor trailer moving van driver, general laborer, and assembler. She classified the assembler position as light exertion level work because the claimant assembled small products; the industrial cleaner, kitchen helper, fast food cook, and general laborers positions as medium exertion level work; and the tractor

trailer moving van driver position as very heavy exertion level work because it involved moving furniture work. (R.54).

The ALJ asked Ms. Stroud to assume that the claimant could never work on ladders, ropes, scaffolds, or at unprotected heights; could understand simple instructions; could carry out simple tasks over two-hour period across an eight-hour workday, five-day workweek with all customary breaks; could have his own workstation with occasional contact with the general public but no direct contact with the general public; and could have occasional contact with coworkers and supervisors, with infrequent changes in the work environment. Ms. Stroud testified that a person with these limitations could perform the industrial cleaner position as the claimant performed it.

The ALJ asked Ms. Stroud if this individual would be able to perform any other unskilled jobs with these limitations. (R. 55).  Ms. Stroud testified that a person with these limitations could perform jobs as a laundry worker at the medium exertion level, with approximately 140,000 jobs in the national economy; as a landscape specialist at the medium exertion level, with approximately 196,000 jobs in the national economy; or as a garment sorter at the light exertion level, with approximately 117,000 jobs in the national economy. (R. 56).

Ms. Stroud also testified that an individual with marked limitations in maintaining concentration, persistence, pace; marked limitations in social interaction; or frequent episodes of decompensatin would be unable to maintain competitive employment.   She stated that the claimant's limitations in hearing and responding to voices would prevent the claimant from maintaining steady employment unless he was in a sheltered-type atmosphere, with accommodation from that employer. (R. 56-59).

*The ALJ's Decision*

22

On July 6, 2018, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 7–23). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through March 31, 2019 and had not engaged in substantial gainful activity since his alleged onset date of May 14, 2014. (R. 12). Next, the ALJ found that the claimant had the severe impairments of schizophrenia, bipolar disorder with manic and psychotic features, and cannabis dependence. (R. 13).

The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered whether the claimant met the criteria of "paragraph B" for listings 12.03 and 12.04 dealing with schizophrenia and psychotic disorders, but concluded that the claimant only had moderate restrictions in his activities of daily living; moderate difficulties in maintaining social functioning and interacting with others; moderate difficulties in maintaining concentration, persistence or pace, understanding, remembering, or applying information; and mild limitations in adapting or managing oneself. To support his conclusion, the ALJ noted that based on the claimant's medical history, doctors observed the claimant's fair to intact memory; cooperative attitude; fair to good eye contact; generally normal, intact concentration; a thought process ranging from delusional to logical; auditory hallucinations; average intellect; fair hygiene and appropriate dress; and ability to drive and go the library to use the computer. (R. 13–14).

The ALJ found that the claimant did not meet Listing 12.03C because the "medical evidence of record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in his environment or to demands that are not already part of the claimant's daily life." He stated that "the claimant indicated no mental difficulties with

self-care and only a mild limitation in navigating social issues.  Such evidence does not support a finding of serious and persistent mental disorders."  (R. 14).

Next, the ALJ determined that the claimant had the residual functional capacity to perform a full range of work at all exertional levels, except that the claimant could not work on ladders, ropes, scaffolds, or at unprotected heights for safety reasons; could understand and remember only simple instructions; could carry out simple tasks for two-hour periods across an eight-hour day, five-day workweek with all customary work breaks; should have his own workstation; could have occasional contact with the public, but no direct contact with the public; could have occasional contact with co-workers and supervisors; and could adapt to infrequent, gradual changes in the workplace. (R.15).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence. Specifically, the ALJ noted that the claimant had been non-compliant with his medications; his mental status examinations were generally normal; his memory ranged from poor to intact; he had a cooperative attitude; he made fair to good eye contact; his speech ranged from monotone at times to generally normal; his concentration was intact though auditory hallucinations were present; he had average intellect; he was appropriately dressed and groomed; he was regularly stable; he had a mood ranging from irritable to euthymic; and he had partial to good insight.

Regarding the claimant's allegations that the voices affected his concentration, the ALJ noted that the claimant goes to the store to buy his cigarettes; uses money to buy "weed"; shops

at stores; plays basketball; drives a car; goes to the library and gets on the internet; takes care of his personal needs; and cleans his house. The ALJ found that the claimant's ability to do these activities "tends to erode the claimant's statements as to the severity of his mental limitations." (R. 20).

The ALJ also noted that, during his consultative examination with Dr. Anderson, the claimant reported that he was able to care for his own personal hygiene, prepare simple meals, clean, and do his own shopping. (R. 16–17). The ALJ further noted that the claimant had a long history of cannabis dependence, where he reported to doctors that he occasionally smoked marijuana and continued to smoke it even though advised by doctors that it could be exacerbating his complained symptoms. Consequently, the ALJ determined that the claimant's subjective allegations of his symptoms and abilities were not fully credible. (R. 22)

The ALJ gave partial weight to the opinions of State Agency psychological consultant Dr. Robert Estock. The ALJ gave substantial weight to the opinion of Dr. Estock that the claimant would be able to understand and remember simple instructions; carry out simple tasks for extended periods in the regular workday; function best with his own work-space apart from others; and could adapt to infrequent changes in the workplace. (R. 81). But the ALJ gave no weight to the parts of Dr. Estock's opinions that the ALJ interpreted to be conclusory, speculative, vague, or inconsistent with the record. Specifically, the ALJ found that Dr. Estock's opinions that the "[c]laimant would *likely* require assistance establishing/carrying out work-related, long-term goals and plans;" that "[c]ontact with the public and coworkers should be *casual*;" and that "*[c]riticism and feedback* in the workplace should be *supportive* and *non-confrontational*," were conclusory, speculative, uncertain, vague, and not defined by the

*Dictionary of Occupational Titles* or the Social Security Regulations, and, therefore, should be given no weight. (R. 17).

The ALJ gave little weight to the opinion of Dr. Trevor Lindsay, who assessed to claimant's functional capacity at the time of his March 2015 involuntary admission. Dr. Lindsay indicated that the claimant had a poor memory; fair problem solving and decision-making skills; a poor ability to identify and communicate his needs; and a poor ability to maintain his physical and emotional health needs. (R. 440). The ALJ gave little weight to Dr. Lindsay's opinion because it was inconsistent with her finding that the claimant could independently perform his activities of daily living, and, therefore, inconsistent with evidence of record. (R. 18, 441). Additionally, the ALJ explained that these functional limitations only reflected a moment in time when the claimant was involuntarily committed, and did not reflect the evidence as a whole. (R. 18).

The ALJ gave no weight to consultative examiner Dr. Justin Anderson's opinions because he found that they were unclear and lacked sufficient explanation for use in questioning a vocational expert. Specifically, the ALJ viewed Dr. Anderson's opinion that the claimant would have "marked" limitation in his ability to sustain concentration, persistence, and pace for tasks and in his ability to interact socially as unsupported by any portion of the record. Specifically, the ALJ stated that Dr. Anderson's opinion undermined his own examination that the claimant appeared oriented to person, place, time, and circumstances with an intact attention and concentration. Further, the ALJ argued that Dr. Anderson's opinion conflicted with the claimant's own reports that he got along well with his coworkers; had never been arrested; cleaned; prepared simple meals; and went shopping for his own personal needs. Dr. Anderson also opined that the claimant had moderate limitations in his ability to adapt to the routine

stressors/changes of a general work environment, but offered no explanation for support, or explanation of what he considered "routine stressors/changes" and general work environment. However, the ALJ indicated that Dr. Anderson's opinion that the claimant was capable of understanding and remembering simple and detailed instructions and sustain for two-hour periods was consistent with the evidence. (R. 19).

In addition, the ALJ gave no weight to the opinions of Licensed Professional Counselor Reese Jefferson, MS, or Nurse Practitioner Sean Riggs that the claimant met or equaled Listing 12.03. The ALJ concluded that neither Ms. Jefferson nor Mr. Riggs were doctors or proper medical sources to offer an opinion as to whether the claimant met or equaled a Listing of Impairment. (R. 19).

The ALJ also gave limited weight to the claimant's mother's opinions because they were based upon observation and subjective complaints.  (R. 18).

Finally, the ALJ found that the claimant was unable to perform substantial gainful activity in his past relevant work. In making his determination, the ALJ relied on the testimony of vocational expert Ms. Stroud, who testified that, with the exception of the industrial cleaner work, an individual with the claimant's impairments would be unable to perform his past relevant work. (R. 21). However, the ALJ found that the claimant was capable of making a successful adjustment to other work that exists in significant numbers in the national economy, such as a laundry worker, landscape specialist, and a garment sorter. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 22).

## DISCUSSION

The claimant argues that substantial evidence does not support the ALJ's reasons he found the claimant did not meet or equal Listing 12.03C. This court agrees.

To meet Listing 12.03C, the claimant must show that his schizophrenia is "serious and persistent" with a "medically documented history of the existence of the disorder over a period of at least 2 years" and both of the following:

> 1.    Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [his] mental disorder; and
> 2.    Marginal adjustment, that is, [he has] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03.  The ALJ found that the medical evidence in the record "does not support a finding of serious and persistent mental disorders."  He also found that the claimant does not have a minimal capacity to adapt to changes in his environment or to demands that were not already part of his life. To support these findings, the ALJ listed two grounds: "the claimant indicated no mental difficulties with self-care and only a mild limitation in navigating social issues." But these grounds do not show that the claimant does not have a serious and persistent mental disorder or that he fails to meet Listing 12.03C.

First, substantial evidence in the record does not support the ALJ's finding that the claimant's schizophrenia is *not* a *serious* and *persistent* mental disorder.  The medical records show that the claimant has suffered from hallucinations and delusional thoughts because of his schizophrenia since at least 2011.  As fully set out in the facts section, the claimant constantly hears voices; thinks the voices are trying to steal his identity; talks back to the voices; and is frustrated because the voices affect his concentration and ability to hold a job.  He experienced episodes of decompensation that led to hospitalizations in 2011, 2012, 2013, 2014, and 2015 because of his schizophrenia. The record is replete with evidence of continued psychosis even while receiving consistent, weekly or bi-monthly mental health therapy and medication injections every three weeks.  No doctor, therapist, or family member has ever insinuated that the

28

claimant does not suffer from the hallucinations and delusions caused by his schizophrenia. The ALJ's finding that the claimant's schizophrenia is not serious and persistent actually goes against the weight of the substantial evidence in the record.

And the ALJ's reasons for finding that he does not have a minimal capacity to adapt to changes in his environment or demands that are not already part of his routine do not pass muster. The fact that the claimant reported that he does not have difficulty with self-care, visits with friends on occasion, or gets along with co-workers does not negate that he in fact has a minimal capacity to adapt to *changes* in his environment or to *new demands* in his life. Being able to take a bath, get dressed, prepare simple meals, attend therapy, and take medications as part of self-care have no bearing on whether the claimant can function with all the changes and increased demands that come with a full-time working environment. And his claim that he gets along with co-workers does not negate that he cannot handle the stressors or demands that come with working full-time because of his schizophrenia.

In fact, each time the claimant sought and obtained employment during the relevant time period, the records indicate that he was fired or let go because his schizophrenia prevented him from meeting the demands of new job. The claimant's failed efforts to work and history of many jobs for short periods of time ending with the claimant getting fired supports that he cannot meet the demands of working full time. The actual result when the claimant tried to work with his schizophrenia strongly favors that the claimant meets Listing 12.03C.

In April 2014, his mother reported to his therapist that the claimant "tried to keep a job but does not last more than a month or two" because of his schizophrenia. The claimant was involuntarily committed to Huntsville Hospital a month later in May 2014. In June 2014 the claimant indicated that he was working for a landscaping company, but he lost that job a few

weeks later because he could not keep up with the pace of the job and needed help from his co-workers.  By July 2014, his therapist reported "bizarre" behavior from the claimant from dragged-out speech to odd gestures with his fingers.  In July 2015, the claimant's mother reported that his co-workers get upset or afraid when the claimant talks back to the voices while he tried to work.  On October 13, 2015, the claimant reported to his therapist that he had been working for a month, but he had been fired by his October 28, 2015 session because "he did not do well working because he heard the voices" and that "he messed up on the job while cleaning."  In several sessions after this firing, he reported that the voices were getting worse and he failed to attend therapy from January 2016 to June 2016.  In June 2016, the claimant told Ms. Jefferson that he tried to work a part-time job, but "he has difficulty maintaining on task due to the voice talking to him constantly." He said, "I'm going to do my best . . . but it gets hard with the voices there."  The ALJ did not mention or discuss any of the claimant's many failed attempts to work because of his schizophrenia.

And each time the claimant attempted to live outside of his mother's home, he could not handle the demands of leaving that structured environment.  In her  July 11, 2015 "Function Report—Adult—Third Party", his mother stated that the claimant lives with her; she takes him to his doctor's appointments; and she gives him his medications.  But outside of that structured environment, the claimant cannot function.  In 2011, he claimed that no one in his family cared about him and indicated he lived by himself "with others."  He was sleeping outside on the street, was not taking his medications, and ended up hospitalized.  Then, when he again left the structure of his mother's home in September 2014 and moved to Las Vegas to live with his brother and ended up in Los Angeles, he decompensated.  He ended up back home with his mother by March 2015 because she sought after him, and he ended up hospitalized because his

condition worsened.  Again, the ALJ did not mention or discuss the claimant's inability to function independently outside of his mother's home.

The substantial evidence in the record shows that the claimant's schizophrenia is serious and persistent and that he has a minimal capacity to adapt to changes in his environment or the demands of a full-time job.  The court finds that substantial evidence does not support the ALJ's reasons for finding that the claimant did not meet Listing 12.03C.

*Other Concerns--Weight Given to Medical Opinions*

The court is also concerned that the ALJ gave great weight to parts of the opinion of Dr. Estock, who only reviewed the claimant's medical records, and gave no weight to the opinion of Dr. Anderson, who personally examined the claimant in addition to reviewing his medical records.  The opinions of non-examining physicians, including state agency psychological consultants like Dr. Estock, are generally entitled to little weight when contrary to those of an examining physician, "and standing alone do not constitute substantial evidence." *See Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987).  And in general, the more consistent a physician's opinion is with the record as a whole, the more weight an ALJ can place on that opinion. 20 C.F.R. § 404.1527(c)(4).

In this case, the reasons that the ALJ gave to discredit Dr. Anderson's opinion do not seem to pass muster.  The ALJ found that Dr. Anderson's opinion that the claimant had marked restrictions in both his ability to sustain concentration, persistence, and pace and his ability to interact socially was unsupported by *any* portion of the record.  But that statement is not true. The claimant's testimony at the hearing and statements to his therapist that the voices he hears affect his concentration and ability to hold a full-time job; his mother's statements that the claimant cannot keep a job for more than a month or two because of his schizophrenia; his failed

31

efforts to work and his history of many jobs for short periods of time ending with the claimant getting fired because of his schizophrenia; his very limited social interactions with anyone other than his family; and his mother's statements that his past co-workers were frustrated with or afraid of the claimant when he talked back to the voices while at work all support Dr. Anderson's findings in these two areas.

And Dr. Anderson's findings of marked limitations in these two areas were supported by the opinion of the claimant's therapist Ms. Jefferson, who treated him consistently for several years and who held a Master's Degree as a Licensed Professional Counselor.  Although Ms. Jefferson is not an "acceptable medical source" under the Social Security Regulations, the ALJ must evaluate her opinion along with the other evidence in the record.  *See* SSR 06-03P (applicable to cases filed before March 2017).

As a counselor, Ms. Jefferson's opinion is considered a "non-medical source" who has had contact with the claimant in her professional capacity, and her opinion is a "valuable source of evidence for assessing impairment severity and functioning."  See *Id.*  "Often, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." *Id.* In evaluating Ms. Jefferson's opinion, the ALJ should have considered the factors set out in 20 C.F.R. § 404.1527(d) and 416.927(d), including how long Ms. Jefferson has known the claimant, the frequency of the counseling sessions, and how consistent her opinion is with the other evidence in the record.  Of all the specialized opinions in the record, Ms. Jefferson knew the claimant the best and treated him consistently for many years.  But instead of considering her opinion that the claimant met Listing 12.03, the ALJ refused to consider it because she was not

an acceptable medical source and he failed to articulate any other reasons for failing to consider her opinion.

And Dr. Anderson's opinion was also consistent with that of Nurse Practitioner Riggs, who saw the claimant on several occasions and who opined that the claimant met Listing 12.03C. Although NP Riggs was not considered an "acceptable medical source" when the claimant filed his claim,[5] the ALJ should have considered his opinion as an "other source" using the same factors in 20 C.F.R. § 404.1513(d) and 416.913(d) as discussed above. Again, the ALJ did not consider NP Riggs' opinion because he was not an acceptable medical source and he failed to give any other reasons for discounting that opinion.

Instead, the ALJ cherry picked the parts of Dr. Estock's opinion that he wanted to give great weight, discounted the parts of Dr. Estock's opinion that showed that the claimant had greater mental limitations, and seemingly ignored the opinions of Dr. Anderson, Ms. Jefferson, and NP Riggs that supported that the claimant met Listing 12.03 because of his schizophrenia. On remand, the ALJ may want to further address these concerns.

## CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED to the ALJ for actions consistent with this opinion.

This court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 25th day of September, 2020.

_Karon O. Bowdre_
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE

---

[5] For claims filed on or after March 27, 2017, nurse practitioners are now considered "acceptable medical sources." *See* POMS DI 22505.003